UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.K.J., individually, and successor in interest to the Deceased, ALEAH JENKINS, by and through his guardian-ad-litem, JEREMY HILLYER,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO et al.,<br><br>Defendants. | Case No.: 19-CV-2123-CAB-RBB<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>[Doc. No. 7] |

This matter is before the Court on Defendants' motion to dismiss the complaint. The motion has been fully briefed, and the Court held a hearing on February 13, 2020. For the following reasons, the motion is granted.

**I.  Allegations in the Complaint**

On November 27, 2018, Defendant San Diego Police Officers Lawrence Durbin, Nicholas Casciola, and Jason Taub pulled over a vehicle in the La Jolla neighborhood of San Diego for having an expired registration. [Doc. No. 1 at ¶¶ 27, 36.] Aleah Mariah Jenkins was a backseat passenger in the vehicle. [*Id.*] During the stop, Jenkins was responsive and answered questions posed by the officers. [*Id.* at ¶ 28.] She also "complied with [the officers'] request that she be handcuffed, and she gave [them] permission . . . to search her and her belongings." [*Id.*]

At some point, Jenkins was placed in a patrol car where she began vomiting. [*Id.* at ¶ 30.] One of the officers asked Jenkins if she was "withdrawing" and told her to stick her head out of the car window. [*Id.*] In response, Jenkins told Durbin that she was sick and was pregnant. [*Id.*] Durbin then told one of the other officers, "don't worry about it." [*Id.*]

After Jenkins had vomited on herself, Durbin told her that "because she had once been arrested on her twin sister's warrant, he needed to take her downtown to police headquarters for fingerprinting." [*Id.* at ¶ 32.] Jenkins then asked Durbin for a napkin and some water, and Durbin responded that he did not have anything to give her but that he would get her some water when they got to the watch commander. [*Id.*] Durbin then began driving Jenkins to San Diego Police headquarters in downtown San Diego. [*Id.* at 34.]

During the drive to police headquarters, Jenkins complained of feeling sick and asked Durbin for water several times. [*Id.* at 35.] She repeatedly asked Durbin for help, and at one point screamed in distress and said, "Please, help me!" [*Id.*] Durbin "ignored her repeated pleas for help and dismissed them." [*Id.* at ¶ 37.] He also asked Jenkins "What's going on?" and "What are you doing?" [*Id.* at ¶ 38.] At one point during the drive, Durbin got out of the car and reprimanded Jenkins, telling her "to knock it off" and telling her, "you're fine." [*Id.* at ¶ 39.] During this stop, Durbin opened the door to the patrol car which cause Jenkins to partially fall out of the car. [*Id.*] Durbin "pushed her body back into the back seat and slammed the vehicle door on her." [*Id.*]

The drive to police headquarters took over an hour. [*Id.* at ¶ 40.] During the drive, Durbin did not "summon medical care, request assistance from other officers, inform dispatch that [Jenkins] may need medical attention, and/or take [Jenkins] to any number of hospitals on the route." [*Id.*] Upon arrival at police headquarters, when Durbin opened the back door to his patrol car, Jenkins began screaming for help, to which Durbin responded, "Stop hyperventilating. You're doing that to yourself." [*Id.* at ¶ 41.] He also told her she was "faking it" and that it could lead to another charge if she continued to resist." [*Id.*]

Durbin then pulled Jenkins out of the patrol car and laid her on the ground. [*Id.* at ¶ 42.] He took Jenkins fingerprints while she was on the ground and placed her back into

2

the patrol car. [*Id.*] Some time later, Durbin returned to the patrol car to check on Jenkins. [*Id.* at ¶ 43.] He then summoned medical attention, stating "I can't tell if she is breathing or not." [*Id.*] Jenkins subsequently went into a coma and then died on December 6, 2018. [*Id.* at ¶ 44.]

On December 13, 2019, Jenkins' minor son, J.K.J., through his biological father and general guardian Jeremy Hillyer, filed this lawsuit, naming Casciola, Taub, and Durbin in their individual capacities, David Nisleit, in his individual capacity and in his official capacity as chief of police for the San Diego Police Department, and the City of San Diego, as defendants. Defendants now move to dismiss the entire complaint or in the alternative to strike Plaintiff's claim for punitive damages.

## II. Legal Standard for Motions to Dismiss

The familiar standards on a motion to dismiss apply here. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). On the other hand, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Nor is the Court "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotation marks omitted).

### III. Discussion

The complaint asserts six claims—four under 42 U.S.C. § 1983, and two under California state law. The four § 1983 claims are labeled: (1) unreasonable search and seizure—detention and arrest; (2) unreasonable search and seizure—denial of medical care; (3) municipal liability for unconstitutional custom or policy; and (4) deprivation of life without due process. The third claim is made against the City and Police Chief Nisleit, while the other three are against Officers Casciola, Taub, and Durbin. The complaint also asserts a claim for negligence under California Government Code § 820 and California common law against all defendants, and a claim for failure to summon immediate medical care under California Government Code § 845.6 against the City and Officers Casciola, Taub, and Durbin.

#### A. Survival Claims versus Wrongful Death Claims

A fundamental flaw in the complaint concerns its failure to distinguish between Jenkins' claims that survive her death (if any), commonly referred to as "survival claims," and claims of J.K.J. for his injuries resulting from Jenkins' death, commonly referred to as "wrongful death" claims. The complaint categorizes each of the six claims as being both a survival and wrongful death claim.

##### 1. Survival Claims

"In a survival action, a decedent's estate may recover damages on behalf of the decedent for injuries that the decedent has sustained. In a wrongful death action, by comparison, the decedent's dependents may only pursue claims for personal injuries they have suffered as a result of a wrongful death." *Davis v. Bender Shipbuilding & Repair Co.*, 27 F.3d 426, 429 (9th Cir.1994)). "[U]nlike a wrongful death action, a survival action is a cause of action that existed while the decedent is alive and survives the decedent." *Adams v. Superior Court*, 196 Cal. App. 4th 71, 78-79 (Cal. Ct. App. 2011). "A claim under 42 U.S.C. § 1983 survives the decedent if the claim accrued before the decedent's death, and if state law authorizes a survival action." *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006). "The party seeking to bring a survival action bears the burden

4

19-CV-2123-CAB-RBB

of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1228–29 (9th Cir. 2013) (citation omitted). Thus, to survive a motion to dismiss Plaintiff's survival claims, the complaint must satisfy California's requirements.

"California's statutory requirements for standing to bring a survival action are stated under California Code of Civil Procedure § 377.30: 'A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest ..., and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest.'" *Hayes*, 736 F.3d at 1229; *see also Tatum*, 441 F.3d at 1093 n.2 ("Where there is no personal representative for the estate, the decedent's 'successor in interest' may prosecute the survival action if the person purporting to act as successor in interest satisfies the requirements of California law. . . ."). Here, J.K.J. alleges that he is Jenkins' successor in interest pursuant to California Code of Civil Procedure § 377.60(a). Section 377.60(a), however, concerns standing for wrongful death actions. *Stennett v. Miller*, 34 Cal. App. 5th 284, 290 (Cal. Ct. App. 2019).

Pursuant to California Code of Civil Procedure § 377.32, a survival action in California must be accompanied by an affidavit including, among other things, "[i]f the decedent's estate was administered, a copy of the final order showing the distribution of the decedent's cause of action to the successor in interest," along with facts supporting statements that the affiant is either the decedent's successor in interest or is authorized to act on the successor in interest's behalf, in the action. Cal. Civ. Proc. Code § 377.32(4)-(5). Contrary to Plaintiff's opposition brief, this requirement has not been satisfied here through Jeremy Hillyer's declaration that he is J.K.J.'s general guardian. Whether Hillyer is J.K.J.'s general guardian is a separate issue from the question of whether J.K.J. is Jenkins' successor in interest, which for the purposes of filing a survival action, "means the beneficiary of the decedent's estate or other successor in interest who succeeds to a

cause of action or to a particular item of the property that is the subject of a cause of action." Cal. Civ. Proc. Code § 377.11. Accordingly, because Plaintiff has not satisfied the requirements under California law for bringing a survival action, any claim intended to be a survival claim is dismissed on this basis alone.[1]

### 2. Wrongful Death Claims

"In California, a wrongful death cause of action 'is wholly statutory in origin.'" *Stennett*, 34 Cal. App. 5th at 290. The wrongful death statute, California Code of Civil Procedure § 377.60, specifies who may bring a wrongful death claim and "is strictly construed." *Id.* Under Section 377.60(a), a "cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by," among others, the decedent's "children," or by "the decedent's personal representative on their behalf."

Section 1983 actions may only be survival actions. *See Estate of Lopez v. Torres*, 105 F. Supp. 3d 1148, 1159 (S.D. Cal. 2015); *see also Herd v. County of San Francisco*, 311 F. Supp. 3d 1157, 1163-64 (C.D. Cal. 2018) (dismissing minor daughter's individual § 1983 claim for excessive force and denial of medical treatment arising out of the shooting of her father by police, stating that "Plaintiff A.G. may not bring these claims personally because she was not directly subjected to excessive force or denied medical treatment."). Thus, "'wrongful death' actions by a surviving relative cannot be brought under Section 1983, as constitutional rights cannot be vicariously asserted." *Hernandez-Cortina v. Cty. of Riverside*, No. EDCV1801579DDPSPX, 2019 WL 403957, at *3 (C.D. Cal. Jan. 30, 2019); *see also Herd*, 311 F. Supp. 3d at 1165 ("Fourth Amendment rights are personal 'and may not be vicariously asserted.'") (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). Accordingly, to the extent the four federal claims, each brought under 42

---

[1] *See generally Hayes*, 736 F.3d at 1229 ("While claiming she is the decedent's 'sole surviving heir,' Appellant fails to allege that she is her father's personal representative or successor in interest. Indeed, Appellant argues only that standing is appropriate under section 377.60, not section 377.30. There is no indication whether Appellant has filed the affidavit necessary under California law to commence a survival action as a decedent's successor in interest, *see* Cal.Civ.Proc.Code § 377.32, or whether survival claims may now be timebarred if Appellant has failed to do so.").

U.S.C. § 1983, are intended to be wrongful death claims seeking damages for J.K.J.'s injuries, they are dismissed with prejudice.[2]

### B. Section 1983 Claims Against Officers Casciola and Taub

A second flaw in the complaint is that it groups the three officers who participated in the initial traffic stop together and alleges that they are all equally liable for five of the six claims asserted. Yet, "[l]iability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Here, the only event where Officers Casciola and Taub had any role was the initial traffic stop, which the complaint does not allege was improper. Aside from their participation in the initial traffic stop itself, the complaint does not allege any facts about Officers Casciola or Taub that could support a finding of liability under any claims asserted in the complaint. The only allegations concerning Jenkins' medical condition while Officers Casciola and Taub were present in some capacity was that she vomited on herself and said it was because she was pregnant and sick. These outward signs of sickness, in light of Jenkins' explanation and Officer Durbin telling them "don't worry about it" [Doc. No. 1 at ¶ 30],

---

[2] Because Plaintiff has not satisfied California's requirements to bring a survival action, and the § 1983 claims cannot be wrongful death claims, the only claims not subject to dismissal at this point in the analysis are the state law wrongful death claims. As discussed in Section III.G., *infra*, the Court declines supplemental jurisdiction over the remaining state law claims, so this opinion does not address whether Plaintiff has standing to bring those claims as a wrongful death action. That being said, California's intermediate appellate court recently held that the term "children" as used in Section 377.60(a) is ambiguous, and that "the legislative history confirms that when the Legislature used the term 'children' in section 377.60, it referred to persons entitled to take from the decedent under California's intestate succession laws." *Stennett*, 34 Cal. App. 5th at 293. The Court held that "the fact that [the decedent] is her biological father, without more, is not enough to create wrongful death standing." *Id.* at 296. Based on this authority, the complaint's allegation that J.K.J. is the natural born child of the decedent, particularly in light of evidence in the record that Jenkins did not have custody of J.K.J. at the time of her death [Doc. No. 5], may not be sufficient to establish J.K.J.'s standing to assert wrongful death claims under California law. This is a novel state law issue that is best resolved by California's state courts.

7

19-CV-2123-CAB-RBB

do not, without more, create a plausible claim that Officer Casciola or Officer Taub violated Jenkins' constitutional rights or acted negligently for not immediately obtaining medical care for her.

Further, because Officers Casciola and Taub were not present for the drive downtown, they cannot be held liable based on any change in Jenkins' condition during that drive or afterward. *See generally Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."). Thus, because the complaint does not state a claim against Officers Casciola or Taub based on whatever limited roles they had during the traffic stop, it is dismissed without prejudice as to any claims against Officers Casciola and Taub.

### C. Unreasonable Search and Seizure—Detention and Arrest

The complaint asserts this claim against Officers Casciola, Taub, and Durbin, but for the reasons discussed above, it is dismissed as to Officers Casciola and Taub. Moreover, because Plaintiff fails to comply with California's requirements for a survival action, and because this claim cannot be brought as a wrongful death action, the claim must be dismissed as to Officer Durbin as well. Nevertheless, even assuming Plaintiff has or can satisfy the requirements for standing to assert a survival claim under this theory against Officer Durbin, this claim still must be dismissed because the complaint fails to allege sufficient facts, taken as true, to state a plausible survival claim against Officer Durbin.

The claim is only for wrongful "detention and arrest" of Jenkins. The complaint does not allege that the initial stop of the vehicle in which Jenkins was a backseat passenger was wrongful, and as discussed above, Casciola and Taub's involvement was limited to the stop itself. The complaint then generally alleges that the three officers detained Jenkins without reasonable suspicion and arrested her without probable cause in violation of her right to be secure against unreasonable searches and seizures under the Fourth Amendment to the Constitution as applied to state actors pursuant to the Fourteenth Amendment. [Doc. No. 1 ¶¶ 50.] It alleges that the three officers "are liable . . . either because they were integral participants in the wrongful detention and arrest, or because they failed to intervene

8

to prevent these violations." [*Id.* ¶ 52.] According to the complaint, the only reason given to Jenkins for her detention was that because she had been arrested once on her twin sister's warrant, they needed to take her downtown to police headquarters for fingerprinting. [*Id.* ¶ 53.]

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons ... against unreasonable ... seizures.'" *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917 (2017). "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

In the motion to dismiss, Defendants argue that the complaint lacks adequate factual allegations concerning if and when Jenkins' detention became an arrest. This distinction is relevant because a "detention" does not require probable cause, while an "arrest" must be supported by probable cause. *See Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) ("If Gallegos's detention was an arrest, the Constitution requires that the arresting officers have probable cause to justify their actions."); *see also United States v. Bravo*, 295 F.3d 1002, 1009 (9th Cir. 2002) ("At issue here is whether a 'detention,' which does not require probable cause, evolved into an 'arrest,' which must be supported by probable cause."). The opposition, meanwhile, completely ignores the distinction, referring to this claim only as one for "unlawful arrest" and arguing only that the complaint alleges adequate facts to demonstrate the lack of probable cause. Accordingly, the Court considers any claim that the detention of Jenkins was unconstitutional to have been abandoned and considers only whether the complaint adequately alleges an unlawful arrest.

Necessarily, to state a claim for unlawful arrest, the complaint must adequately allege that Durbin arrested Jenkins. "[N]ot every detention by law enforcement officials amounts to arrest or custody under the Fourth Amendment. Arrests and detentions are both 'seizures' under the Fourth Amendment, but only the former requires a showing of probable cause, while the latter can be justified by reasonable suspicion of criminal

activity." *United States v. Charley*, 396 F.3d 1074, 1079 (9th Cir. 2005) (citing *Brown v. Texas*, 443 U.S. 47, 51 (1999)). "There is no bright line rule for determining when an investigatory stop crosses the line and becomes an arrest." *Gallegos*, 308 F.3d at 991 (internal quotation marks and citation omitted). "[A]n investigative detention does not automatically become an arrest when officers draw their guns, . . . use handcuffs, . . . or place a suspect in the back of a patrol car. *Gallegos*, 308 F.3d at 991. "[T]he police may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of achieving the legitimate goals of the detention 'given the specific circumstances' of the case." *Charley*, 396 F.3d at 1080.

Here, the complaint alleges only that Durbin handcuffed Jenkins and took her downtown to police headquarters in the back of his police cruiser for fingerprinting because she had previously been arrested on her twin sister's arrest warrant. These facts, without more, do not automatically convert the detention of Jenkins into an arrest. *See generally Gallegos*, 308 F.3d at 991-92 (holding that no arrest occurred when police stopped the plaintiff in his truck, drew their guns on him and ordered him to exit the truck, handcuffed him and transported him to scene of a burglary, where a witness said that he was not the burglar). It is unfortunate that Durbin encountered traffic on the way to the station extending the detention to over an hour, but the "cases impose no rigid time limitation on *Terry* stops." *Id.* at 992 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). Moreover, there are no allegations that Durbin did anything to unnecessarily delay the detention.

Ultimately the alleged point of the detention, based on the allegations in the complaint, was to confirm Jenkins' identity through fingerprinting because she has a twin sister. There are no factual allegations that the investigation itself was not legitimate, such as that there was no outstanding arrest warrant on either Jenkins or her twin sister (or that

she does not have a twin sister), or that the method being pursued was unreasonable.[3] That Jenkins became ill and ultimately went into a coma before the fingerprint identification could be completed does not convert the stop into an arrest. Taking the allegations in the complaint as true, the complaint does not allege an arrest, making the alleged lack of probable cause immaterial. Accordingly, the first claim for unlawful arrest without probable cause does not state a claim and is subject to dismissal on this ground as well.

### D. Unreasonable Search and Seizure—Denial of Medical Care

The complaint asserts that this claim is premised on a violation of Jenkins' Fourth Amendment rights applied to state actors by the Fourteenth Amendment. Plaintiff mistakenly argues that this claim arises under the Fourth Amendment based on *Tatum v. City and Cty. of S.F.*, 441 F.3d 1090, 1098-99 (9th Cir. 2006). *Tatum*, however, concerned a claim that officers' decision not to perform CPR on an arrested suspect constituted excessive force. *Tatum*, 441 F.3d at 1098. More recent authority, meanwhile, holds that a claim for denial of medical care by a pretrial detainee arises out of the Fourteenth Amendment's Due Process Clause. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc). Accordingly, the Court analyzes whether the complaint states a claim for deliberate indifference to Jenkins' medical needs under the Fourteenth Amendment.

"In the Ninth Circuit, the test for deliberate indifference consists of two parts." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). The plaintiff "must first show a 'serious medical need' by demonstrating that 'failure to treat [plaintiff's] condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (internal quotation marks omitted) (citing

---

[3] Allegations that Durbin could have proceeded in a different manner to confirm Jenkins' identity will not necessarily cure this defect in the complaint. "The Fourth Amendment does not mandate one and only one way for police to confirm the identity of a suspect. It requires that the government and its agents act *reasonably*." *Gallegos*, 308 F.3d at 992.

*Jett*, 439 F.3d at 1096).[4] Upon demonstration of a serious medical need, the plaintiff must then show that the defendant's response was deliberately indifferent. *Id.* at 786. The deliberate indifference standard is an objective one. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (citing *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)); *cf. Narcisse v. Tafesse*, No. 5:16-CV-00682-EJD, 2019 WL 4417635, at *5 (N.D. Cal. Sept. 16, 2019) (holding that *Gordon* focused only on the requisite state of mind for a defendant's conduct and did not eliminate the requirement that plaintiffs also show the existence of a serious medical need). The Ninth Circuit recently enumerated the objective deliberate indifference components as:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125. The Ninth Circuit further explained:

> "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" [*Castro*, 833 F.3d] at 1071 (quoting *Kingsley*, 135 S.Ct. at 2473; *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id*. (quoting *Daniels*, 474 U.S. at 330–31, 106 S.Ct. 662). Thus, the plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id*.

*Id.* "A court must make this determination from the perspective of a reasonable officer on

---

[4] Although *Edmo* and *Jett* consider claims for denial of medical care in violation of a prisoner's Eighth Amendment rights, the analysis is identical to a claim for a pretrial detainee's claim for denial of medical care in violation of her Fourteenth Amendment due process rights. *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) ("Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards.").

the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015); *see also Neuroth v. Mendocino Cty.*, No. 15-CV-03226-RS, 2018 WL 4181957, at *10 (N.D. Cal. Aug. 31, 2018) ("Deliberate indifference claims, however, cannot be evaluated on the basis of 20/20 hindsight.").

Here, the complaint does not adequately allege a serious medical need based on what any of the officers knew at the time at least until Jenkins and Durbin arrived at police headquarters and Jenkins became unconscious. Before then, the only factual allegations about Jenkins' condition are that she vomited, which she told Durbin was because she was pregnant and sick, and that she groaned, grumbled, and asked for water and help during the ride from the traffic stop to police headquarters. [Doc. No. 1 at ¶¶ 30, 35.] The complaint repeatedly states that Jenkins "displayed obvious signs of extreme physical distress and needed medical attention" [*Id.* at ¶ 36; *see also id.* at ¶¶ 39, 40], but other than Jenkins vomiting one time (which she attributed to her pregnancy) and her non-specific requests for help, the complaint does not allege what those obvious signs of distress were. Indeed, based on the allegations in the complaint, Jenkins had no visible physical injuries, she was conscious for the entire trip to police headquarters, and she even started "screaming for help," after they arrived at the station. [*Id.* at ¶ 41.] Thus, based on the allegations in the complaint there does not appear to be any indication that Jenkins had a serious medical need such that it would have been objectively apparent that she was at risk of serious injury or death if she did not receive immediate treatment.

Even assuming that the allegations in the complaint were sufficient to demonstrate a serious medical need, the allegations do not support a plausible claim that Durbin's response was objectively deliberately indifferent. Jenkins' vomit and pleas for help, without more, and particularly in light of Jenkins' statement that the vomit was the result of a pregnancy and illness, would not have caused a reasonable officer in the circumstances to have appreciated that there was a high degree of risk in not taking her to a hospital or calling an ambulance. Only with the 20/20 vision of hindsight based on the tragic outcome

could it be found that a reasonable officer in Durbin's situation would have known that, assuming the truth of all of the factual allegations about Jenkins' condition during the traffic stop and on the ride to police headquarters, proceeding to the station instead of to a hospital would have obvious serious medical consequences. Accordingly, the Court finds that the complaint does not state a claim for denial of medical care in violation of Jenkins' Fourteenth Amendment Due Process rights.

### E. Deprivation of Life Without Due Process

Defendants argue in their motion that this claim is duplicative of the denial of medical care claim. In the opposition, Plaintiff does not argue otherwise, stating only that claim is governed by the same standards as the denial of medical care claim. Accordingly, this claim is dismissed for the same reasons as the denial of medical care claim.

### F. Municipal Liability

The complaint also asserts a claim against the City and Police Chief Nisleit for the alleged constitutional violations that allegedly resulted in Jenkins' death. "Neither a municipality nor a supervisor, however, can be held liable under § 1983 where no injury or constitutional violation has occurred." See *Jackson v. City of Bremerton*, 268 F.3d 646, 653–54 (9th Cir. 2001) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Thus, because the complaint fails to state a claim for violation of Jenkins' constitutional rights, this claim fails as well. Moreover, even assuming the complaint does state a claim for violation of Jenkins' constitutional rights against Officers Durbin, Casciola, or Taub, this claim would be subject to dismissal as discussed below.

#### 1. Police Chief Nisleit

The complaint purports to sue Chief Nisleit in both his individual and official capacities. "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under section 1983." *Taylor*, 880 F.2d at 1045 (citing *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680–81 (9th Cir. 1984)); *see also Iqbal*, 556 U.S. at 676 ("Based on the rules our

14

precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). The complaint makes no allegation that Chief Nisleit participated in, directed, or was even aware of the traffic stop and subsequent detention of Jenkins. Accordingly, any individual claims against Chief Nisleit are dismissed on this ground as well.

Further, "[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008); *see also Kentucky v. Graham*, 473 U.S. 159, 167 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell* [], local government units can be sued directly for damages and injunctive or declaratory relief."). Having dismissed the individual capacity claims against Chief Nisleit, the official capacity claims are therefore subject to dismissal because they are also brought against the City, making Chief Nisleit a redundant defendant.

### 2. The City

Following *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "it is well-settled that in claims brought under 42 U.S.C. § 1983, municipalities are liable only for constitutional violations resulting from an official 'policy or custom.'" *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1216 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 694). "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691 (*emphasis* in original). "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997). Put differently, "a municipality sued under § 1983 is not subject to vicarious liability for the acts of its agents." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001).

"The 'first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Castro*, 833 F.3d at 1075 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989)). "[I]t is not enough for a § 1983 plaintiff to merely identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. "A plaintiff cannot prove the existence of a *municipal* policy or custom based on solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989); *see also City of Canton*, 489 U.S. at 391 ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").

The complaint does not adequately allege a specific official municipal policy that caused any of the constitutional violations (inadequately) alleged in the complaint. The vague purported "policies" listed in paragraph 65 of the complaint and relied on in the opposition by Plaintiff are merely conclusory statements that, if sufficient, would effectively hold the City liable simply for employing Officers Durbin, Casciola, and Taub and simply because Jenkins' constitutional rights were allegedly violated. Indeed, the first purported "policy" alleges that Officers Durbin, Casciola, and Taub were not following written official policies, implying that if the City's policies had been followed, the alleged constitutional violations would not have occurred. [Doc. No. 1 at ¶ 65.a.] "Mere negligence in training or supervision . . . does not give rise to a *Monell* claim." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Meanwhile, other purported "policies" were specific to what happened with Jenkins as opposed to generally applicable policies. Accordingly, even if the complaint stated a plausible claim for violation of Jenkins' constitutional rights, the *Monell* claims would be subject to dismissal.

### G. State Law Claims

Having dismissed Plaintiff's federal claims, the Court's "decision of whether to

exercise supplemental jurisdiction over the remaining state law claims 'is purely discretionary.'" *Couture v. Wells Fargo Bank, N.A.*, No. 11-CV-1096-IEG (CAB), 2011 WL 3489955, at *4 (S.D. Cal. Aug. 9, 2011) (quoting *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009)); *see also Holt v. First Franklin Fin. Corp.*, No. C 10-5929 SBA, 2011 WL 4595195, *4 (N.D. Cal. Sept. 30, 2011) ("When the federal claims that served as the basis for jurisdiction are eliminated, either through dismissal by the court or by a plaintiff amending his or her complaint, federal courts may decline to assert supplemental jurisdiction over the remaining state law causes of action.") (citing 28 U.S.C. § 1367(c)(3)).

Here, because the Court is dismissing the only federal claims at the outset of the litigation, it is more appropriate to decline supplemental jurisdiction over the state law claims than to wade into the plainly state law issues that remain in this case. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (holding that "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice"); *see also Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) ("A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'") (quoting 28 U.S.C. § 1367(c)(3)).

Moreover, other grounds listed in 28 U.S.C. § 1367(c) also support declining supplemental jurisdiction. In particular, the state law claims raise several novel and complex issues of state law including: (a) whether Plaintiff has standing to bring a wrongful death claim under California law, *see* Note 2, *supra*; and (b) statutory immunity under the California Government Code. *See* 28 U.S.C. § 1367(c)(1). Further, the federal claims are survival claims, meaning that, to the extent he has standing, J.K.J. is seeking relief for Jenkins' injuries for her heirs. On the other hand, the state claims are wrongful death claims seeking relief for J.K.J.'s personal injuries. Thus, J.K.J. asserts the state claims in an entirely different capacity as a plaintiff. This exceptional circumstance is another compelling reason for declining jurisdiction. *See* 28 U.S.C. § 1367(c)(4).

## IV. Disposition

As discussed above, it is hereby **ORDERED** as follows:

1. Defendants' motion to dismiss is **GRANTED**;
2. All wrongful death claims under 42 U.S.C. § 1983 are **DISMISSED WITH PREJUDICE**;
3. Claims one, two, and four for relief under 42 U.S.C. § 1983 as survival claims are **DISMISSED WITHOUT PREJUDICE**;
4. Claim three for relief under 42 U.S.C. § 1983 is **DISMISSED WITHOUT PREJUDICE** as a survival claim against the City, and **DISMISSED WITH PREJUDICE** as to David Nisleit;
5. The Court declines to exercise supplemental jurisdiction over claims five and six. Those claims are **DISMISSED WITHOUT PREJUDICE** to refiling in state court; and,
6. Plaintiff may file an amended complaint no later than **March 13, 2020**. If an amended complaint is not filed by that date, the Clerk of Court shall close this case.

It is **SO ORDERED**.

Dated: February 13, 2020

_____
Hon. Cathy Ann Bencivengo
United States District Judge

18

19-CV-2123-CAB-RBB